**JAMES WOOD GENERAL TRADING ESTABLISHMENT, a corporation, Plaintiff,**

**v.**

**Jacques COE, Ferdinand Gutenstein, Jerome S. Weinberg, Joseph F. Sullivan and Florence Coe, doing business as Jacques Coe & Co., Defendants.**

United States District Court
S. D. New York.

Feb. 14, 1961.

Fleischmann, Jaeckle, Stokes & Hitchcock, New York City, W. A. Newcombe, New York City, of counsel, for plaintiff.

Jacob Gruber, New York City, for defendants.

BICKS, District Judge.

Plaintiff, a corporation organized under the laws of the Principality of Liechtenstein, brings this suit against the defendants, citizens of the State of New York, who as co-partners are a member house of the New York Stock Exchange, to recover damages for breach of contract and negligence.

The same generating facts are relied on to support each of the claims. It is alleged that the defendants committed a breach of contract in that they failed to sell plaintiff's holdings of 1,000 shares of Baltimore & Ohio common stock ("B&O" stock) as directed, when the price went "above 58" on the New York Stock Exchange. The second claim is predicated upon defendants' negligence in omitting to consummate said sale.

Mario Quarti, a resident of Italy, with a residence or office in the City of Milan, was the plaintiff's agent, authorized to deal with the defendants in the buying and selling of securities. Angioleto Moretti was a "customers man" employed by the defendants, authorized to deal with the plaintiff in security transactions. At the times material here, Quarti and Moretti had known one another for approximately 46 years and for a number of years Quarti, either individually or as a representative of the plaintiff, had been a customer of the defendants and had dealt with them through Moretti.

During October 1956 plaintiff owned 1,000 shares of the common stock of B&O, 4,500 shares of Menasco Manufacturing ("Menasco") and 500 shares of Vanadium Corporation ("Vanadium"), all of which shares were in the custody of the defendants. Sometime during that month Moretti wrote Quarti recommending the sale of B&O "if it went up to 57 or 58". In October or November 1956 Quarti, on behalf of the plaintiff, sent instructions to the defendants to sell the 1,000 shares of B&O "above 58", the 500 of Vanadium "above 49", and the 4,500 Menasco "at 6¼ or better". Receipt of these instructions was acknowledged by Moretti on behalf of the defendants in a letter dated November 19, 1956 wherein he stated in part as follows: "BO. * * * I note that you authorize to sell this stock above 58. Unfortunately, I doubt that it will go there soon; but with time I imagine it might be able to do it. * * * Vanadium * * * Thank you for the authority to sell it above 49 * * * Menasco * * * It is alright to sell it at 6¼ or better." Between December 17, 1956 and December 26, 1956 the 500 shares of Vanadium were sold at prices ranging from 49¾ to 50½, and between January 2, 1957 and January 24, 1957 the 4,500 shares of Menasco were sold at prices ranging from 6¼ to 6½.

On July 25 and 26, 1957 a total of 22,200 shares of B&O were traded on the New York Stock Exchange at a price in excess of 58. Some of the larger blocks sold were: 5,000 at 58½, 1,000 at 58½, 900 at 58½, 400 at 58½ and 500 at 58⅛; in all there were 117 trades at above 58. Moretti virtually conceded that if he had put in an order at 58⅛ he would probably have been able to sell plaintiff's 1,000 shares. He also conceded that "the market at the particular moment was very strong". Moretti never entered an order to sell B&O above 58 prior to or on July 25 and 26, 1957. He did not give an order to the specialist in that stock, nor did he cause any confirmation of that order to be sent to the plaintiff. Instead of making any record of this order in accordance with the customs and usages of the business, he contented himself merely with keeping it in mind. As a result plaintiff's 1,000 shares were not among those sold during that two day period. This controversy stems from that omission. The Court

**332**

finds that if· an order to sell plaintiff's 1,000 shares above 58 had been duly and regularly placed by defendants' representative, those shares could have been sold on July 25th or 26th.

At issue are: the nature of the order, whether it was one good till cancelled or a discretionary order; the effect, if any, of Quarti's conduct after the receipt of Moretti's letter of July 16, 1957 and, assuming liability, the proper measure of damages to be applied.

The defendants contend that their acceptance of the order to sell B&O "above 58" obligated them only to use their discretion and judgment to sell at prices above 58 and in quantities and at times as they deemed advisable. This is in accord neither with the terms of the order nor the evidence.[1] The order obligated Moretti, on behalf of the defendants, to sell as many shares of B&O above 58 as the market would absorb at the first opportunity. That the defendants were obligated to sell when the price of B&O exceeded 58 appears also from the interpretation the parties placed upon the order to sell 500 shares of Vanadium "above 49" and 4,500 shares of Menasco "at 6¼ or better" contained in the same letter.

Matteo Mosca, an expert witness called by the defendant, testified concerning customary practices in the securities market. He testified: that when an order to sell above a specified price is given, the broker should treat the order as Good Until Cancelled (G.T.C.); that the broker should send a confirmation at the time the order is received and should send monthly confirmations of the order

thereafter; that it would not be common practice for the representative of the brokerage house to keep such an order in his head; that, if at the time the order is given the market price of the stock is considerably below the price specified in the order and, after a while, the price approaches the specified figure, a customers' man should check with his customer and remind him that the stock is approaching the price specified in the order and should ask for more specific instructions; that, if he does not hear from the customer, he should start to sell the stock above the specified price.

The omission of words indicating a purpose to confer discretion in the execution of the order to sell B&O appears to have been intentional. When Quarti intended to confer discretion he did so unmistakably, viz., in his letter of June 4, 1957, in which he said:

"South Porto Rico S. Co.: * * * I think there isn't any appreciable risk and start with 500 shares, giving you discretion to buy 500 more as soon as the stock gives any hint of moving * * * I am recommending you to follow closely your operator so that he may pick up the most opportune moment around 34–33.⅝ as it was a couple of days ago. For the second lot, you shall see yourself when it moves to buy it even without asking me: in such a case I shall let you have the money within 4 days."

Moretti never reminded Quarti by mail or by cable of the existence of the order when the price of B&O began to approach 58.[2] During the course of fre-

---

1. The evidence relating to the terms of the order to sell B&O referred to in the text, supra, consists solely of Moretti's letter of November 19, 1956 confirming the order. According to Moretti, Quarti's letter giving the order was sent to storage sometime between March and June, 1957, together with other 1956 correspondence from Quarti concerning the plaintiff's account. It is asserted that search of the defendants' storage facilities has failed to uncover the 1956 correspondence from Quarti concerning the plaintiff's account.

2. The defendants argue that Moretti's letter of July 16, 1957 constituted such a reminder, but an examination of the pertinent parts thereof shows clearly that it made no mention of the order: *"BO goes well,* and is now 55. There is a possibility—only a possibility—that they may increase the dividend, which is 50 cents quarterly, to perhaps 60 or 70, or that they may give, towards November, an extra dividend of $1.00. My opinion in this respect is that it would be well to sell around 58-60. But, since

quent correspondence between Moretti and Quarti from November 19, 1956 to November 14, 1957 in which Moretti almost always quoted to Quarti the market price of the securities held by the defendants for the plaintiff, including B&O, no mention was made of the unexecuted order to sell "above 58". Nor had any confirmation of said order ever been sent. From all the circumstances, the conclusion is inescapable that Moretti forgot the existence of the order some time prior to sending his letter of July 16, 1957, referred to in footnote 2, supra. Said letter was clearly not intended to serve as a reminder of the order. Both parties had obviously forgotten the existence of the order. It came to light later only after Quarti, disappointed in the market action of the stock, examined his correspondence file and chanced across the letter dated November 19, 1956, in which receipt of the order was acknowledged.

■ Moretti's failure to record or recall the order and his failure to execute it constituted a breach of contract and negligence.[3]

The defendants rely upon Moretti's letter of July 16, 1957, Quarti's letter of August 5, 1957, and Moretti's letter of August 12, 1957[4] as establishing the defenses of waiver, estoppel and ratification. It is clear from the correspondence that Quarti did not remember the order at the times those letters were written, or at any time thereafter prior to November 14, 1957. At no time in the course of an extensive correspondence between November 19, 1956 and November 14, 1957 was any mention made by either party of the order. Quarti's letter of November 14, 1957[5] stated that "Considering that the subject B.O. is rather burning, I wished to look over once again all information that you progressively gave me about the stock * * * I was struck by your letter of November 19, 1956, where, at the end of the third paragraph and referring to B&O, you wrote: '*I note that you authorize me to sell this stock above 58.*'" This is the first mention of the order by either Moretti or Quarti subsequent to November 19, 1956.

■ It must be shown that the plaintiff had full knowledge of its rights

I remember that you received the information when you bought it, from London, I think it would be well that you should consult again London to know what they think *now* of BO, *and at what price* they would sell it."

3. Assuming, arguendo, that Moretti did not forget the order, the failure to execute it under the circumstances presented by the evidence would constitute a breach of contract and negligence.

4. The first of the letters is quoted in pertinent part in footnote 2, supra. Quarti's letter of August 5, 1957 reads in pertinent part:

"After your last letter I had written to London for *B.O.* and I have received an informative bulletin on it, all roses & flowers, developing the concept to which you yourself had hinted; after which I saw the stock at 58 and I was tempted *to cable you to sell*. I did not do it only for the optimism of those informations and yours. If by a lucky chance it should go above 60—*let us say 60 net for me* —I would sell at least one half. * * * I would like to sell with all caution to get the best out of it. Please write to me in this respect."

In his letter of August 12, 1957, Moretti wrote in part:

"*BO* as a 'hunch' I had advised you to sell at 58, where it went, Now it is about 53. * * * I think that even if the market will drop somewhat, BO should not drop more than a few points, to recover later on. I accept anyway your idea, and tomorrow I shall put an order to sell 500 at 61, good till cancelled (g.t.c.). At 61 remains a net for you of something more than 60."

5. Moretti's letter of November 9, 1957 to which Quarti was responding, reads in pertinent part:

"*BO*. This is a painful arrow in the side. In a nutshell, this is the story: we have been caught in a true recession * * * Now, this recession I had *in part* foreseen, in fact I wrote to you about it several times. I did not foresee however that BO could be hit to this extent, otherwise, I would have advised you to sell *at best* * * * I had given you in part the right idea advising you to sell one half of BO at 58 where it went (high was 58.5/8) You put an order *to sell 500 at 61, where it did* not go * * *."

in order to find that the plaintiff waived them, see Alsens American Portland Cement Works v. Degnon Contracting Co., 1917, 222 N.Y. 34, 118 N.E. 210; Draper v. Oswego County Fire Relief Ass'n, 1907, 190 N.Y. 12, 16, 82 N.E. 755, and in order for the plaintiff to be estopped, see Rothschild v. Title Guarantee & Trust Co., 1912, 204 N.Y. 458, 464, 97 N.E. 879, 41 L.R.A.,N.S., 740. Ratification requires notice by the principal of what his agent failed to do. See Leviten v. Bickley, Mandeville & Wimple, 2 Cir., 1929, 35 F.2d 825, 827; Gillett v. Whiting, 1894, 141 N.Y. 71, 35 N.E. 939. Upon the facts of this case and the Court's finding that when Moretti sent the letter of July 16, 1957 and when Quarti received said letter neither had in mind the then existing order to sell B&O which had been acknowledged on November 19, 1956, none of these defenses is available.

■ The defendants have also raised the defense of an account stated. They contend that since the defendants sent to the plaintiff monthly statements of account for July, August, September and October, 1957, which showed that the defendants held for the plaintiff 1,000 shares of B&O stock and the plaintiff or its agents made no objection to these accounts, the plaintiff is bound by them. The defendants in relying upon the doctrine of an account stated misconceive the nature of this defense. As the Court put it in Rodkinson v. Haecker, 1928, 248 N.Y. 480, 484–485, 162 N.E. 493, 495:

"An account stated is nothing more or less than a contract express

or implied between the parties. It is an agreement which they have come to regarding the amount due on past transactions."

See also, Lockwood v. Thorne, 1858, 18 N.Y. 285. Clearly, the defense is inapplicable here.

■ With regard to the computation of damages, the defendants were obliged to sell as many of the 1,000 shares of B&O stock above 58 as the market would absorb at any given time. A fair measure of damages to compensate the plaintiff for the defendants' breach of contract and negligence is the difference between $58\frac{1}{8}$, the price at which the plaintiff's stock should and could have been sold on July 25 and 26, 1957, and the mean between the high and the low at which said stock could have been sold within a reasonable time after the plaintiff discovered the defendants' wrong,[6] less an allowance for proper selling commissions,[7] together with interest from July 26, 1957[8] and costs. The court finds (i) that plaintiff discovered defendants' wrong on November 14, 1957; (ii) that a reasonable time under the circumstances was one week; and (iii) that during the week succeeding November 14, 1957 the price range was $24\frac{1}{4}$ to $34\frac{5}{8}$, with a mean of $29\frac{7}{16}$.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S. C.A.

So ordered.

---

6. Mayer v. Monzo, 1917, 221 N.Y. 442, 117 N.E. 948 indicates that a week is a reasonable time. This should be especially true where the plaintiff's representative resided in Italy and the defendants' representative resided in New York.

7. For deduction of said commissions, see White v. Smith, 1874, 54 N.Y. 522.
   The parties have stipulated that the Court may take judicial notice of the New York Stock Exchange Rules in effect during 1957 in determining the amount

of proper commissions which would have resulted from a sale of 1,000 shares of B&O common stock on July 25 or 26, 1957. These rules indicate that the amount of proper selling commissions is $408.10. See New York Stock Exchange Directory and Guide (Sept. 16, 1957 Edition), par. 2381.14.

8. See Steinbugler v. William C. Atwater & Co., 2d Dept. 1942, 264 App.Div. 864, 35 N.Y.S.2d 349, affirmed 1943, 289 N.Y. 816, 47 N.E.2d 432.