PSG CO., a corporation, and Philip S. Greenberg, Appellants,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee.

No. 22560.

United States Court of Appeals
Ninth Circuit.

Oct. 1, 1969.

Rehearing Denied Nov. 10, 1969.

Gerald J. O'Connor (argued), of Sullivan, Roche, Johnson & Farraher, San Francisco, Cal., Franklin, Olsen, Bennett, Des Brissy & Jolles, Portland, Or., for appellant.

Norman J. Wiener (argued), of King, Miller, Anderson, Nash & Yerke, Portland, Or., for appellee.

Before HAMLEY and BROWNING, Circuit Judges, and REAL, District Judge[*].

REAL, District Judge:

PSG Co., an Oregon Corporation, and Philip S. Greenberg (hereinafter referred to jointly as appellant) filed a complaint against Merrill Lynch, Pierce, Fenner & Smith, Inc., a Delaware corporation, for breach of an alleged agreement to accept appellant's business of buying and selling commodity futures contracts up to a maximum of 300 [1] contracts open, praying judgment in the amount of $45,221.68 and punitive damages for willful, wanton and malicious conduct. Two other causes of action were alleged which do not concern us here since they were settled at the time of trial.

Jurisdiction of the federal district court was based on 28 U.S.C. § 1332(a) (diversity). Our jurisdiction on appeal is based on 28 U.S.C. § 1291.

## BACKGROUND

PSG Co., an Oregon corporation, is wholly owned by Philip S. Greenberg. Since 1963, appellant has been engaged in the business of buying and selling commodity futures contracts. Appellee is a member of the New York Stock Exchange and the principal commodity exchanges in the United States, London and world markets. As a broker, appellee places orders received from its customers for the purchase and sale of futures contracts on the exchanges where they are traded.

---

[*] Honorable Manuel L. Real, United States District Court for the Central District of California, sitting by designation.

[1] An account limit is the number of futures contracts a broker will carry on margin at any one time.

In 1963, appellant opened accounts with appellee for the placing of orders of purchase and sale of commodities on margin. At that time appellee informed appellant of account limits and these were revised from time to time until, in 1965, the limits of appellant's combined accounts were 100 contracts straddled[2] and 100 contracts open.[3]

By October 22, 1965 appellant held with appellee 587 sugar contracts, with 207 contracts open. At 6:15 A.M. on October 22, 1965 appellee notified appellant that it would receive liquidating orders only from appellant with a limit of only 100 contracts open.

Suit then followed in the United States District Court—the appellant claiming—that appellee had agreed to accept appellant's business up to a maximum of 300 contracts open at any one time—that appellee's action was without prior notice—that as a result appellant was damaged in the sum of $45,821.68—and that appellee's conduct was a breach of a fiduciary duty appellee owed to appellant entitling appellant to $500,000.00 in punitive damages.

After the first day of trial, appellee moved to remove the issue of punitive damages from the case. This motion was granted by the trial court.

This appeal is concerned only with (1) the propriety of granting a motion for directed verdict[4] as to appellant's first cause of action for breach of alleged agreement, (2) removal of the issue of punitive damages, and (3) failure of the trial court to permit appellant to amend the complaint to state a cause of action for violation of the Robinson-Patman Act.

## MOTION FOR DIRECTED VERDICT

At trial appellant maintained that appellee was bound to handle all its business up to 300 contracts open and that before appellee could reduce these trading limits it had to give appellant reasonable notice.[5]

2. A contract is straddled when there are offsetting positions of short and long, i. e., if a person is in a long position on 100 contracts and in a short position of 50 contracts, the result would be 50 contracts straddled and 50 contracts net long or open.

3. An open contract is an incomplete position in which the long or short position has not been covered by a corresponding sale or purchase of the commodity being traded.

4. Although denominated a motion to dismiss, the action of the trial judge was entirely consistent with the consideration and granting of a motion for directed verdict and our consideration is on consideration of substance—not form. Wolf v. Reynolds Electrical & Engineering Co., 9th Cir. 1962, 304 F.2d 646; Johnson v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 9th Cir. 1968, 400 F.2d 968; Fruit Industries Research Foundation v. National Cash Register Co., 9th Cir. 1969, 406 F.2d 546.

5. Appellant has advanced two different theories during various stages of the proceedings in support of this contention. In the complaint and in the pretrial order, appellant urged a straight contract theory; i. e., that in January and August, 1963, Greenberg and PSG Co., respectively, entered express agreements establishing credit and trading accounts with appellee for the purchase and sale on margin of commodity future contracts on domestic and foreign commodity exchanges of which appellee was a member; that the agreements provided for certain margin requirements and trading limits (the maximum amount of open contracts which plaintiffs could have at any one time); that these trading limits were occasionally revised upwards; that in March, 1965, the trading limits were set at 300 contracts open and the margin requirements were set at $125 per contract open and $63 per contract straddled; and that it was understood and agreed by both parties that in the event appellee wished to cancel or modify the trading limits or margin requirements, it would give appellant reasonable notice before doing so. At trial appellant abandoned the contract theory, conceding that there was no written agreement (Record, vol. 2, at 93) and no quid pro quo offered by way of bilateral promise (Record, vol. 3, at 251), and switched to a theory of promissory estoppel. Record, vols. 2 & 3, at 123–127, 250–251. By this latter theory appellant contends appellee promised him

■ In ruling upon the motion for directed verdict, the trial court found that a promise was made by appellee to handle all of appellant's business up to 300 open [6]—that appellant built its position in reliance on this promise—and that this promise could be terminated by appellee in accordance with the custom of the trade.[7] The trial court then granted the motion on the ground that the appellant had failed to produce any evidence that the contract was terminated contrary to the custom of the trade.

While it is doubtful that appellant or its witnesses established that there was a custom within the commodity business for a brokerage firm to give advance notice of a change in limits, there was ample testimony in the record that upon reduction of trading limits it was the custom in the trade to give a customer reasonable time to liquidate his position.[8] Evidence before the trial court indicated that on October 22, 1965 appellee gave appellant oral and written notice that it would thereafter accept only liquidating orders. Appellant testified, however, that appellee refused a number of liquidating orders placed by appellant. This evidence raised factual questions and should have been submitted to the jury. If this ground alone supported the grant of the motion for directed verdict, reversal would be required.

The trial court in granting the motion for directed verdict was convinced that

---

that he would handle all of appellant's business up to 300 contracts open; that appellant built up his position in reliance on this promise; and that it was understood, by both parties at the time appellee made this promise that the trading limits would not be unilaterally changed by appellee without giving reasonable notice to appellant. On appeal, appellant asserts both theories, now asserting, apparently for the first time, that the consideration for appellee's March, 1965 oral promise was appellant's commitment of all its commodity trading business to appellee and the knowledge by appellee that it would take a number of trading days before appellant could switch brokers in the event appellant should deem such a switch necessary or desirable. We need not decide the question of whether appellant can now reassert his contract theory—expressly abandoned at trial—since the trial court ruled that a binding promise was made by appellee to handle all of appellant's business up to 300 open. This is the maximum that could have been achieved through appellant's contract theory, since the understanding or agreement that appellee would not reduce appellant's trading limits without reasonable notice—advanced in both theories—was based solely on an alleged custom of the trade and not on any oral or written statement to that effect by either party. Record, vol. 2, at 92.

6. The trial court based this finding on the following two excerpts from Mr. Greenberg's testimony concerning conversations he had with officers or representatives of appellee: (1) "Subsequently, about, I would say a month or two later, sometime in late March-early April, I saw that I was going to have to have 300 lots or 15,000 tons of sugar was going to be needed to bring into Guatemala. I went to Mr. Dulong and Mr. Emlaw, and we discussed it fully; and in a matter of a day or two or three days, they came back and said, 'Fine. We will handle it. We'll take care of you. We'll take delivery for you, and your limits are 300 open.'" Record, vol. 2, at 29, 31–32. (2) "I said, 'Fine.' He asked me if Portland was taking good care of me, and I said, 'Yes.' He asked me if my limits of 300 were satisfactory. I said, 'Yes, they were.' And he said, 'Fine.'" Record, vol. 2, at 41.

7. Record, vol. 3, at 269–270. In Oregon, as elsewhere, custom may be used to interpret an ambiguous contract, but before it can be used, it must be shown that the custom was known to the parties, or was so generally known that the parties may be presumed to have known of it and to have contracted with reference to it. Smith v. Abel, 1957, 211 Or. 571, 316 P.2d 793, 804.

8. Record, vol. 2, at 132, 193, 211–215. In ruling on the motion to dismiss, the trial judge remarked that it was the custom of the trade "that when the limits are reduced, a reasonable amount of time is given to liquidate." Record, vol. 3, at 269.

the damages which were attempted to be proved were speculative. We agree.

██ Although appellant introduced evidence its book value of contracts would have increased had it orders been honored, there was no evidence introduced that the actual liquidation of these orders resulted in any loss. Appellant's financial loss is the ultimate measure of his damage. Damages cannot be based on speculation or guesswork.[9] Anderson v. Mt. Clemens Pottery Co., 1945, 328 U.S. 680, 688, 66 S.Ct. 1187, 90 L.Ed. 1515; Smith v. Abel, 1957, 211 Or. 571, 316 P.2d 793, 802; Cf. James Wood General Trading Establishment v. Coe, 2d Cir. 1961, 297 F.2d 651; see also Restatement (Second) of Agency § 400, comment b (1958). In the absence of any evidence that appellant suffered any actual damage as a result of appellee's failure to accept liquidating orders, we conclude that the trial court properly directed a verdict for appellee at the close of appellant's case.

## PUNITIVE DAMAGES

██ Generally a suit or action upon a contract will not afford an opportunity for recovery of punitive damages. Weaver v. Austin, 1948, 184 Or. 586, 200 P.2d 593, 600; Brown v. Coates, 1958, 102 U.S.App.D.C. 300, 253 F.2d 36, 39, 67 A.L.R.2d 943; 5 Corbin, Contracts, § 1077. Since the relationship of agent and principal arises out of contract, before punitive damages can be awarded there must be shown a breach of fiduciary duty independent of the cause of action for breach of contract. Harper v. Interstate Brewery Co., 1942, 168 Or. 26, 120 P.2d 757.

██ Appellant alleged an intentional malicious breach of fiduciary duty motivated by self-interest at the expense of the principal. We cannot conjecture any failure of proof of those allegations since the trial court ruled early that the issue was removed from the case. Had the trial court allowed evidence on exemplary damages, it may well have concluded, at the close of appellant's case, that the issue of whether the breach of contract merged with a breach of a fiduciary duty and formed an intentional tort for which punitive damages could be allowed should have been submitted to the jury. In Oregon, however, in order to recover exemplary damages there must be actual damage shown. Exemplary damages can never constitute the basis for a cause of action. Martin v. Cambas, 1930, 134 Or. 257, 293 P. 601; Weaver v. Austin, supra; Lundgren v. Freeman, 9th Cir. 1962, 307 F.2d 104, 119 n. 13. Appellant having failed in its proof of actual damage, there is no reversible error in eliminating proof of exemplary damages in this case.

## ROBINSON-PATMAN ACT VIOLATION

Appellant claims that the trial court erred in not permitting it to amend its complaint to state a cause of action under the Robinson-Patman Act [15 U.S.C. § 13(a)].

9. Appellant does not contest this proposition, but rather asserts that it isn't necessary for a customer whose order has been wrongfully refused to actually place that order again before he can show damages. This proposition may be correct, but only if damages can be shown by means other than by showing that the customer subsequently placed his order and suffered a loss. Cases cited by appellant are inappropriate either because the court specifically held there was evidence of damages in the case (Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Miller, 1966, Tex.Civ.App., 401 S.W.2d 645, 648–649), or the stock was sold after the broker refused to sell, revealing actual damages conveniently measured by the difference between the bid figure at the time of the order and the amount the customer finally realized for his shares (Opper v. Hancock Securities Corporation, S.D.N.Y.1966, 250 F.Supp. 668, aff'd, 367 F.2d 157; Sadtler v. Orton, 1932, 106 Pa.Super. 175, 161 A. 490, 492), or because damages were obvious from the factual context of the case (Mekrut v. Gould, 1959, Sup., 188 N.Y. S.2d 6, 9–10). The case of James Wood General Trading Establishment v. Coe, S.D.N.Y.1961, 191 F.Supp. 330, was reversed on appeal, 297 F.2d 651.

■ Allowance of amendments after a responsive pleading has been served is within the sound discretion of the trial court. Fed.R.Civ.P. 15(a); Caddy-Imler Creations, Inc. v. Caddy, 9th Cir. 1963, 299 F.2d 79; Hancock Oil Co. v. Universal Oil Products Co., 9th Cir. 1941, 120 F.2d 959; Kaplan v. United States, C.D.Cal.1967, 42 F.R.D. 5.

■ Where, as here, a motion to amend is made—nineteen months after the complaint had been filed and served and about one month before trial was set to begin—and where an entirely new and different cause of action, involving complicated legal and factual issues requiring extensive discovery and preparation for trial, is alleged—we can find no abuse of discretion, particularly where the trial court's action does not bar a separate action.

Affirmed.

Moore, Circuit Judge, dissented.