John J. PETER et al., Plaintiffs,

v.

UNION OIL COMPANY OF CALIFOR-
NIA, a corporation, Defendant.

Edward ALJIAN et al., Plaintiffs,

v.

UNION OIL COMPANY OF CALIFOR-
NIA, a corporation, Defendant.

Vernon ANONDSON et al., Plaintiffs,

v.

UNION OIL COMPANY OF CALIFOR-
NIA, a corporation, Defendant.

Nos. 66–1166, 66–1226, 67–1718.

United States District Court,
C. D. California.

June 23, 1971.

James J. Duryea, Maxwell Keith, San Francisco, Cal., Most, Bertram & Brown, Los Angeles, Cal., Ronald L. Goldman, Stanley Davis Brown, Beverly Hills, Cal., for plaintiffs.

Moses Lasky, Richard Haas, Brobeck, Phleger & Harrison, San Francisco, Cal., L. A. Gibbons, Douglas C. Gregg, E. A. McFadden, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

REAL, District Judge.

Plaintiffs are Union Oil dealers and service station operators leasing gasoline service stations from defendant Union Oil Company and dispensing gasoline and other petroleum products to the motoring public.[1]

Union Oil Company (hereafter "Union") manufactures and markets gasoline and other petroleum products and is engaged in marketing activities principally in California, Arizona, Washington, Montana, Utah, Idaho, Nevada, Alaska and Hawaii. Union's world wide oil exploration and raw product procurement supply refineries in California, Washington and Montana. Union's annual revenues exceed two billion dollars.

In 1954 Union first conceived the idea of merchandising its gasoline products through consignee dealers. From its inception until sometime in 1960, Union's consignment program consisted of a Re-tail Dealer Consignment Agreement coupled with a one-year lease. This program was mandatory for anyone desiring to be a Union dealer; no other options were permitted. In 1960, as a result of a consent decree entered by this Court in United States v. Standard Oil Company of California, et al., Civil Action No. 11584–C, commonly called the West Coast Oil case, Union revised its consignment program to provide for a Retail Dealer Consignment Agreement and a three-year lease.[2] Though this program was not mandatory for becoming or continuing to be a Union dealer, it required the consignment relationship if the dealer or prospective dealer wished a three year lease. No one ever requested any other relationship so it is not clear whether or not Union would have devised any other method of creating or continuing a business relationship with dealers refusing consignment.

Consignment as practiced by Union from its inception until April 20, 1964 required dealers to charge retail prices for Union gasoline as specified by Union. Throughout the period of consignment relevant to the actions before the Court, the provisions for determining the price of gasoline were as follows:

"SECOND: Consignee agrees that:

1. * * *

2. He will sell Consignor's gasolines at retail tax-included prices from time to time specifically authorized by Consignor in writing."

On April 20, 1964, the United States Supreme Court in Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (hereafter "Simpson I") found the consignment program of Union in violation of the antitrust laws saying at page 24, 84 S.Ct. at page 1058:

"We hold only that resale price maintenance through the present, coercive

---

1. Plaintiffs Hash, Jackson, Simas and Spence did not lease stations from Union, and the relationship between Union and some plaintiffs had ended before suit was filed on their behalf.

2. The consent decree is reported in 1959 Trade Cases ¶ 69,399.

type of 'consignment' agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage * * *."

Union immediately undertook to revise its gasoline marketing program in an effort to eliminate the proscriptions of *Simpson I, supra.* Thereafter, during August, 1964, Union inaugurated a marketing program utilizing the Retail Dealer Gasoline Storage and Purchase Agreement (hereafter "Storage and Purchase"). This agreement made no provision for control of retail prices by Union. Dealers paid for gasoline at an applicable Dealer Purchase Price at the time of sale to the motoring public. This price was computed as follows:

"4. Dealer shall pay Union for all gasoline purchased by him from it at Union's applicable Dealer Purchase Price in effect at the time and place of sale. Upon receipt of notice from Union of changes in its applicable Dealer Purchase Price, Dealer shall record and report to Union, on forms supplied by it, all gasoline dispenser meter readings and the amount of Union's gasolines stored in said underground tanks."

In addition to Storage and Purchase, Union had available for those dealers who did not desire this program a Retail Dealer Gasoline Purchase Contract (hereafter "Dealer Purchase"). Dealer Purchase, in effect, required the dealer to pay for gasoline delivered at the then applicable Dealer Purchase Price.

These alternatives were distinguishable basically only in the price support aspects of Storage and Purchase. Union would survey retail prices in the various marketing areas in which their dealers were operating and establish a wholesale price that would permit—but not require —dealers to sell at retail prices competitive with dealers of other brands of gasoline in the dealer's marketing area. Dealer Purchase would expose the dealer to the risks inherent in a declining competitive retail market—"gas war".

One need only drive the streets of the Los Angeles Metropolitan Community to realize the relative merits and demerits of such a plan. It is inescapable that this possibility was clearly recognizable since—given the choice—almost every Union dealer chose Purchase and Storage.

Plaintiffs herein complain that both consignment and Storage and Purchase are violative of the antitrust laws, particularly Sections 1 and/or 2 of the Sherman Act [15 U.S.C. §§ 1, 2]. The complaints in Peter, et al. v. Union Oil Company of California, 66–1166–R; Aljian, et al. v. Union Oil Company of California, 66–1226–R; Anondson, et al. v. Union Oil Company of California, 67–1718–R; were all consolidated for trial herein.

The cause has proceeded to a complete trial upon the claim of plaintiff Robert A. Brundage. Since the legal issues are the same in all the cases, the issue of damages is dispositive of the litigation as to the remaining plaintiffs and it is unnecessary to proceed to trial of the factual allegations of liability, impact and damage as to those claims.

## THE CLAIM OF ROBERT A. BRUNDAGE

Plaintiff Robert A. Brundage (hereafter "Brundage") was employed by Union in 1933 in various capacities until approximately August 1946 when he became a Union service station operator. Since that time Brundage has operated as a Union dealer leasing as many as six service station locations from Union at one time. These operations were generally conducted through managers who were on incentive type compensation, i. e., salary and commission, somewhat dependent upon the profitability of the operation of the station he managed.

In 1960, as a result of the consent decree in the *West Coast Oil case, supra,* Brundage was offered three year leases to supersede one-year leases on the five service stations he was then operating. Together with the leases, he was offer-

ed and accepted three year consignment agreements.

These consignment agreements permitted Union to require Brundage to sell Union's gasoline at retail prices determined by Union. Brundage was then required to account to Union for the number of gallons sold at the designated retail price, less stated commissions. These commissions varied from time to time and were dependent upon the retail price designated by Union.

It is Brundage's procedures that are under consideration herein. A Union representative would call the manager of the station concerned and advise him of the retail price change and its effective time. The manager would then "stick" the tanks (measure the gas in the tanks) and take the readings on the gas pump meters for each grade of gasoline. These readings were reported to Union on postcards furnished by Union. On those cards was also placed the new and old retail price. Before prices were actually changed, however, the manager would consult with Brundage. If the manager and Brundage agreed that Union's designated price was competitive, they would post it. If they did not agree, they would maintain whatever price they agreed upon.

Relying on *Simpson I, supra,* Brundage urges that in spite of these procedures there is liability as a matter of law. *Simpson I, supra,* is distinguishable. There the Supreme Court was presented a stipulated set of facts which included a one year lease and a termination of Simpson's lease for failure to comply with Union's pricing policy.

In the instant case we are presented with a factual situation that includes a three year lease, price changes with which Brundage and his manager agreed, and where there was no occasion for termination for failure to follow Union's pricing instructions. In this posture of the evidence, if Union was attempting to coercively fix retail prices in Brundage's service stations, it was in fact only a "paper tiger" for the program of price fixing proscribed by *Simpson I, supra,* never succeeded.

April 20, 1964, the date of *Simpson I, supra,* altered the business relationship of Brundage and Union. Almost immediately Union notified Brundage:

"You are therefore free to set the price at which you sell gasoline to the motoring public * * *."

Shortly thereafter, starting in August, 1964, Brundage voluntarily accepted Union's Retail Dealer Gasoline Storage and Purchase Agreement in lieu of previously existing consignment agreements. At the time of acceptance, Brundage was offered and rejected the Retail Dealer Gasoline Purchase Contract. He now asserts that he was compelled to choose Storage and Purchase because of economic pressures asserted by Union. Those allegations are not supported by credible evidence since it is apparent that Brundage accepted Storage and Purchase because of its advantages in the highly competitive Los Angeles retail gasoline market.

Brundage further contends that Storage and Purchase is merely consignment in disguise because margins between wholesale and suggested retail prices are determined in the same way Union determined commissions on consigned gasoline sold, i. e., on retail selling prices. The evil proscribed in the consignment program considered in *Simpson I, supra,* was not manipulation of commissions but rather as set forth, 377 U.S. at page 21, 84 S.Ct. at page 1056:

"Practically the only power they have to be wholly independent businessmen, whose service depends on their own initiative and enterprise, is taken from them *by the proviso that they must sell their gasoline at prices fixed by Union Oil.*" (Emphasis ours.)

Storage and Purchase leaves free the dealer to set any price his own independent judgment suggests to him. It is true that suggested retail prices are given the dealer but nowhere in the evidence is there any indication that Brundage was compelled to *follow,* or did follow,

the suggested retail price of Union. He paid the wholesale price for gasoline existing at the time of delivery to a motorist without having to account in any way for the retail sales price. There is no fixing of retail prices in Storage and Purchase on these facts.[3]

## THE DAMAGE ISSUE

It is the theory of damages that has concerned this Court throughout the progress of this case. On innumerable occasions the Court urged plaintiffs' counsel to assert the theory of damages upon which plaintiffs were proceeding. On each occasion counsel would vacillate to a point of incomprehensible babble. At the final pretrial, counsel for plaintiffs was admonished that he would be required to assert a theory of damage and to provide the Court a "damage study" setting forth the asserted claim of recoverable damage for each plaintiff.

Plaintiffs filed a so-called "damage study" (marked Exhibit 609 for identification) claiming that the damage was the difference between average commissions allowed or average margins obtained to the date of filing the complaint herein and average commissions earned by plaintiffs in 1968. Nowhere in any discovery or pretrial proceeding on the issue of damages was the 1968 average commission suggested as a norm upon which damages could be measured.[4] Plaintiffs never produced to defendants nor suggested during any of the pretrial proceedings on the issue of damages any underlying data in support of the conclusions set forth in the "damage study". No evidence was presented or suggested that could allow this Court to conclude that 1968 was sufficiently similar—economically or otherwise—to other years so that that year could be used as a norm upon which to base a damage award.

Plaintiffs' counsel excuses these inadequacies, urging on the Court the princi-

ples of Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Flintkote Company v. Lysfjord, 246 F.2d 368 (9th Cir. 1957); and Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964).

These cases lend little support to plaintiffs since counsel confuses the necessity of proof of the *fact* of damage with the so-called weaker proof permissible to show the *amount* of damage. In reviewing the cases, Judge Barnes in Flintkote Company v. Lysfjord, *supra*, sets forth this controlling principle at page 392:

" * * * [T]he cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown before the jury is allowed to estimate the *amount* of damage." (Emphasis in text.)

Counsel for plaintiffs would have the Court disregard the inadequacy of plaintiffs' *theory* of damage based upon these cases which stand for the proposition that "secondary" evidence is allowable to ascertain the *amount* of damage recoverable where the illegal conduct of a defendant makes production of better evidence impossible. Here, only the rejection by plaintiffs of any claim of loss of profits makes such evidence impossible to produce.

Plaintiffs' proposed theory of damages as finally stated by counsel at trial is two-fold, (1) "the greater of the amount of the difference between the actual commission or margin earned and what was base commission or margin at adjustment price," or (2) "the margin which

3. E. g., Susser v. Carvel Corporation, 332 F.2d 505, 510 (2d Cir. 1964), certiorari dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284.

4. Although Plaintiffs' Ex. 609 for identification uses the term "1968 Average Commission," Union dealers then bought and resold gasoline, and, accordingly, realized margins and not commissions.

would have been achieved absent an unlawful price-control scheme or combination as determined by the relevant data in the record."

■ In support of theory No. 1, counsel urges *Hanover, supra,* and *Lessig, supra.*

In *Hanover, supra,* damages were allowed for the difference in cost to plaintiff of leasing shoe machinery or buying shoe machinery rejecting the "passing on" defense urged by defendants. Nowhere in *Hanover, supra,* is there a suggestion that manufacturers or producers are required to guarantee a margin of gross or net profit. In *Lessig, supra,* damages were based upon *loss of profits* and not on guarantees created by violation of the antitrust laws. The *quality* of the proof of those damages was the only issue.

Plaintiffs' theory here falls from yet another consideration of the evidence. The charge made is the fixing of *retail* prices. Certainly, it is conceivable, that damage could result to the retail seller of a commodity as the result of either monopolistic power on the part of Union or conspiracy with the retail seller himself. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982. But, in spite of the emotional charges of monopolistic power counsel would attribute to Union, the facts show that Union was a follower and not a leader in the pricing of gasoline in the Los Angeles Metropolitan area. Its prices were not dropped or raised to secure a monopolistic position in this market but rather to remain competitive in a sharply competitive business. Plaintiffs do not suggest, nor have they indicated to the Court, any evidence that they desired to sell at lower prices (to increase volume and profit) than those required or suggested by Union.[5] It would be only in such a circumstance that plaintiffs could conceivably make any claim of damage to their business or property as a result of any requirement permitting Union to determine retail prices under its consignment agreement. Storage and purchase cannot, in any interpretation or application of plaintiffs' theory of damages, be said to create anything other than the "guaranteed margin" theory which counsel disclaims.

■ Plaintiffs' second theory must meet the same fate, for it proceeds on the premise that gross profits are the measure of damages in antitrust cases. No case has yet so held.[6] As stated before, counsel has not provided the Court with the relevant data to support the theory even if permitted by the cases. The 1968 figures suggested in the Brundage claim fall victim to the prohibition of *Flintkote, supra,* 246 F.2d at 394, that "no attempt having been made to establish a comparison as to either the businesses or the years, the jury verdict predicated on such evidence cannot stand."

## THE EQUITY ISSUE

Litigation of the consignment method of distribution of gasoline adopted by Union has had a long career in the courts. Culminating the first attack, the Supreme Court in *Simpson I, supra,* considering the matter in the posture of a summary judgment, says at 377 U.S. at page 24, 84 S.Ct. at page 1058:

"Hence on the issue of resale price maintenance under the Sherman Act there is nothing left to try, for there was an agreement for resale price maintenance, coercively employed.

---

5. Indeed, plaintiffs' counsel unequivocally advised the Court during pretrial that plaintiffs were not claiming that they could have sold more gasoline than they actually did sell. (Transcript, September 25, 1967, pp. 5, 6)

6. The measure of damages is loss of *net* profits, not *gross* profits. E. g., Simpson

v. Union Oil Company, 411 F.2d 897, 909 (9th Cir. 1969); PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 663 (9th Cir. 1969); Wolfe v. National Lead Company, 225 F.2d 427, 431 (9th Cir. 1955); Kuffel v. Seaside Oil Co., 11 Cal.App.3rd 354, 366, 90 Cal.Rptr. 209 (1970).

\* \* \* We hold only that resale price maintenance through the present, coercive type of 'consignment' agreement is illegal under the antitrust laws \* \* \*."

The Supreme Court then concluded its opinion by stating:

" \* \* \* [W]e reserve the question whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the 'consignment' device which we announce today."

This last statement of the Court started another series of confrontations culminating in Simpson v. Union Oil Company of California, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1961) (Simpson II). The Supreme Court in clarifying *Simpson I, supra,* says at 377 U.S. page 14, 90 S.Ct. at page 31:

"We held when the case was here before that *on the facts of record* the use of the 'consignment' device was within the prohibited ban of price fixing for nonpatented articles, \* \*." (Emphasis ours.)

and further

"The question we reserved was not an invitation to deny the fruits of successful litigation to *this petitioner* \* \* \*. Since parties in other cases might be shown to have structured product distribution on quite different considerations, we reserved the question whether in some of those other situations equity might warrant the conclusion that prospective application was the only fair course."

Plaintiffs' claim that *Simpson II, supra,* forecloses any consideration of equities available to Union in this litigation. Plaintiffs, however, misread and misinterpret *Simpson II, supra.* The Court reaches that conclusion primarily on the language of *Simpson II, supra,* indicating that *Simpson I, supra,* was decided "on the facts of record." Those facts included the coercive effect of a one-year lease, termination of Simpson's lease, and the mandatory aspects of the con-

signment program inaugurated by Union in 1955. No other fact transcends the legality of the natural coercive aspects of a consignment agreement, " \* \* \* recognized by many courts, including this one." *Simpson I, supra.*

Recognizing that collateral estoppel would apply to those facts determined against a party in prior litigation, we do not find the criteria necessary to the application of that doctrine to the instant case.

After the formulation of the "facts" considered by the Supreme Court in *Simpson I, supra,* Union altered its consignment program as the result of the consent decree in United States v. Standard Oil Company of California, et al., Civil Action No. 11584–C, entered by this Court June 19, 1959.

Recognizing the "coercive" aspects of the consignment program as it was then being practiced this Court approved a procedure substituting a three year supply contract and lease and alternatively giving a dealer the opportunity to obtain, if he so desired, a gasoline purchase and sale agreement. Standing alone it would be reasonable for the proponent of a "consignment" program to assume that the vices of the charged "coercive" effects of its prior program were cured. Relying on such a determination by its legal advisors, Union in 1960 altered its consignment program to provide for 3 year terms instead of 1 year terms and giving the dealer the option of participating in a gasoline purchase and sale agreement containing no provision for the fixing of retail prices by Union.

There is yet another aspect of the equities claimed by Union in this litigation. At the inception of its consignment program in 1955, Union had requested and received legal opinions from its legal advisors concerning the legality of its proposed method of marketing its gasoline products.

Relying upon an interpretation of United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed.

362 and the reported state of the antitrust laws, Union inaugurated its consignment program as considered in *Simpson I, supra,* and as later modified in 1960 as hereinabove indicated.

Plaintiffs attack the validity of the legal opinions received by Union. Reviewing the authorities as they then existed it was reasonable for the legal advisors of Union to assume that the consignment program contemplated by Union was within the approved consignment in *General Electric, supra.*[7] It is true, as pointed out in *Simpson I, supra,* that the Court in General Electric was considering patented articles, but the language approving consignment is broader, providing that "the owner of an article patented or otherwise * * *" may determine its price to the ultimate consumer.[8] It would seem, therefore, that at least as to the limitation of General Electric to patented articles, the Supreme Court was announcing a new rule.[9] This is clear since the patent monopoly does not permit or justify *retail* price fixing or maintenance. Patents and their exemption from the antitrust laws could, at least in 1955, be interpreted only to permit price maintenance at a licensee or wholesale level because of the permitted monopoly. Nowhere, before *Simpson I, supra,* could that monopoly standing alone, be extended to a program of retail price fixing.

Having so relied upon the state of the law in 1955 as related by its legal advisor, and having immediately undertaken to correct the retail price fixing aspects of its marketing program the Court finds that prospective application only should be given to the rule of *Simpson I, supra,* as respect the litigants in these consolidated matters.

■■ In summary, the Court finds that there is no violation of the antitrust laws in Union's consignment program as applied to plaintiff Brundage, that as to all plaintiffs their theory of damages are not maintainable under the antitrust laws of the United States, and as to all plaintiffs the equities preclude a damage recovery.

In consideration of the claim of Brundage, judgment shall be for defendant. As to all other plaintiffs, their claims are dismissed. This opinion shall supplement the Findings of Fact and Conclusions of Law filed herewith and where supplementary shall be deemed Findings and Conclusions as permitted by Federal Rules of Civil Procedure Rule 52(a).

The Clerk is ordered to file this opinion, the Findings of Fact and Conclusions of Law and enter judgment accordingly.

---

7.  Simpson v. Union Oil Company of California, 411 F.2d 897, 907 (9th Cir. 1969), reversed on other grounds, 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969);

8.  272 U.S. at 488, 47 S.Ct. at 196.

9.  Simpson v. Union Oil Company of California, 411 F.2d 897, 905 (9th Cir. 1969), and authorities cited in fn. 10, reversed on other grounds. 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969).