**Marvin L. FISHMAN, et al., Plaintiffs,**

v.

**ESTATE OF Arthur M. WIRTZ, et al., Defendants.**

Nos. 74 C 2814, 78 C 3621.

United States District Court, N.D. Illinois, E.D.

Feb. 21, 1985.

---

Bruce S. Sperling, Chicago, Ill., Alan Clack, Racine, Wis., for plaintiffs.

Donald Harris, Richard Levy, Chicago, Ill., for defendants.

Laurence C. Hammond, Milwaukee, Wis., for Chicago Sports.

## ORDER

ROSZKOWSKI, District Judge.

Before the court are defendants' (other than Atlanta Hockey, Inc.) and plaintiffs' motions to amend the judgment order entered November 21, 1984. Defendants seek a reduction in the amount of the judgment order based upon this court's June 28, 1984 findings of fact with respect to the parties' actual and likely arena costs, 594 F.Supp. 853. Plaintiffs' seek to increase the amount of the judgment order based upon certain mathematical errors in the computation of IBI's opportunity costs. In addition, plaintiffs' seek to correct certain typographical errors and amend the date from which post-judgment interest is to be calculated. For the reasons set forth herein, defendants' motion is denied and plaintiffs' motion is granted, in part, and denied, in part.

### I. Defendants' Motion To Amend

#### A. Background

This court previously held that plaintiff, IBI, was entitled to recover any economic benefits it would have enjoyed as a result of owning and operating the Chicago NBA franchise. In determining any likely economic benefits IBI would have derived from ownership, this court held it was reasonable to consider defendant, CPSC's, actual experience in operating the franchise. With appropriate adjustments, this court concluded CPSC's actual experience would provide a "yardstick measure" of IBI's probable economic benefits from owning and operating the franchise.

Among the items considered by this court in determining the costs and expenses IBI would have incurred in owning and operating the franchise was the cost of renting an arena. After considering the parties' probable arena costs, this court concluded there would have been no substantial difference in the amount paid by the parties' for arena rental. Consequently, this court held arena expenses should

not affect the yardstick measure of plaintiff, IBI's, damages.

Defendants contend this court's own findings of fact fail to support the decision not to adjust the yardstick measure of damages based upon arena costs. Instead, defendants' contend this court's findings of fact with respect to the parties' relative arena expenses require a substantial downward adjustment. Specifically, defendants point to the following findings of fact:

1. "In the Spring and Summer of 1972, Elmer Rich, the president of CPBC, negotiated for a lease at the Chicago Stadium on behalf of IBI. At Marvin Fishman's instruction, Rich sought a lease with terms identical to the then current Bulls lease ("the Rich lease"). Fishman never asked Rich to negotiate any reduction in the Rich lease rent terms. He ... was *willing* to take a ten year lease on the rental terms in the lease." (emphasis added).

2. "Under the Rich lease terms, CPBC paid 15% of the first $600,000 in net receipts, two graduated payments on net receipts between $600,000 and $800,000, and 25% of all net receipts over $800,-000."

3. "[In return for a 16.9% equity position in the team], [Arthur] Wirtz ... entered into a ten year lease [with CPSC], which provided for a ten year waiver of all rent on receipts between $1,250,000 and $1,750,000."

4. "... [T]here is nothing in the record which demonstrates that the term of a Fishman lease of the Stadium would have been ten years.... Had a lease shorter than ten years been agreed to ... it is quite possible that IBI would have experienced lower lease expenses than did CPSC. By 1980 the Rosemont Horizon was available and IBI could have insisted on a lower (*i.e.* competitive) rental at the Chicago Stadium. The rental savings to IBI for the ensuing two seasons *alone* could have been between $370,000 and $500,000." (emphasis added).

Defendants contend the foregoing facts indicate IBI would have paid between $421,000 and $560,000 more in lease expenses between 1972–73 and 1981–82. Defendants' contention is based upon the fact that any rental savings brought about by the availability of the Rosemont Horizon in 1980–81 and 1981–82 (between $372,000 and $510,000) would have been more than offset by CPSC's superior leasing arrangement with the Chicago Stadium between 1972–73 and 1979–80 (a difference of $932,-000 in favor of CPSC). Adding on the capital costs to IBI, defendants contend the yardstick damages should be, at a minimum, reduced between $584,000 and $601,-000.

Plaintiffs respond that the defendants have taken one example of "... how IBI might have paid less rent than CPSC for the 1980, and 1981 seasons 'alone'," and attempted to convert it into a series of findings. Plaintiffs, relying upon this court's finding that "... there is nothing in the record which demonstrates that the term of a Fishman lease of the Stadium would have been ten years," set forth several other examples of leasing arrangements which might have resulted in equal or lower lease payments by IBI. For example, plaintiffs point out that:

... IBI could have entered a one year oral lease on the same terms as the prior 'Rich' lease. Thereafter, IBI could have negotiated a four year lease on the same terms as the CPSC ten year lease; and then in 1978, using the leverage of the Horizon which was already under construction, could have negotiated a new ten year lease at the Stadium at a straight 15% (like the newest CPSC lease).

In addition, plaintiffs argue there are reasons other than the existence of the Horizon for believing IBI could have obtained an equal or lower lease arrangement. First, by charging IBI a higher amount than CPSC, plaintiffs contend "... Wirtz would have been breaching his fiduciary duty to [the Norris family, one half owners of the Stadium], by giving special

lease terms to a tenant in which he held a *personal* ownership interest." Second, since defendant, Wirtz's, lease with CPSC was a means of extracting his "pound of flesh" for having "lined up the [NBA] votes to make [their] deal possible", plaintiffs contend IBI may have received even a more favorable lease than CPSC.

### B. Discussion

It is unquestionably difficult to estimate the hypothetical costs and expenses of a party who was wrongfully denied the opportunity to own and operate a franchise. This is extraordinarily true when one of the key expenses, arena rental, was controlled by one of the principal wrongdoers. There is no way of determining exactly what would have transpired.

Plaintiffs are correct in arguing that this court's findings of fact cited simply one example of how the instant events might have transpired. This court did not *find* that IBI would enter into an eight or ten year lease to play in the Stadium. Moreover, this court did not *find* that IBI would negotiate a less favorable lease than CPSC. This court simply found that "[g]iven this uncertainty regarding whether IBI would have experienced greater or lesser lease expense, . . . it is best not to adjust the yardstick for this factor."

█ In concluding it was uncertain whether IBI would have experienced a lesser lease expense, this court did not, as defendants suggest, merely compare the savings of playing the 1980–81 and 1981–82 seasons at the Horizon with the "extra costs" of playing between 1972–73 and 1979–80 at the Stadium. Rather, the court merely found "[t]he rental savings to IBI for [the 1980–82] seasons *alone* could have been between $370,000 and $500,000." (emphasis added) Unstated, as plaintiffs are quick to point out, is the fact that the *approaching* availability of the Horizon may have enabled IBI to negotiate, or renegotiate a more favorable Stadium lease than CPSC. Because of this uncertainty, this court declined to adjust the yardstick for arena rental and declines to do so here.

### II. Plaintiffs' Motion To Amend

#### A. Excess Opportunity Cost

Plaintiffs' motion to amend, in part, addresses the accuracy of this court's calculation of IBI's "opportunity cost." For the purposes of this motion, plaintiffs do not challenge the court's decision to reduce IBI's damages by the amount of the return it could have enjoyed on an alternative safe investment. Instead, plaintiffs simply challenge the figures upon which the calculations were based.

In resolving the issue of "opportunity cost", this court held it was ". . . reasonable to use the amounts actually borrowed by CPSC for the acquisition and initial capitalization of the franchise as the best estimate of what IBI would have borrowed." Moreover, this court found that ". . . IBI would have utilized the same pattern of using equity to fund operating losses that CPSC used." Finally, ". . . by compounding the amount of equity invested annually by IBI or its shareholders times the period of time the equity is invested times the opportunity cost rate", this court held IBI's "opportunity cost" or "imputed interest" could be determined.

In arriving at an actual figure, this court accepted the amount of equity as shown ". . . in alternative assumptions in defendants' damage calculation." As plaintiffs now point out, however, the defendants' opportunity cost calculation was based upon various rejected factual assumptions. Specifically, the amount of equity was overstated by the inclusion of CPSC's higher purchase price ($50,000.00), CPSC's *Fishman* litigation expenses ($1,190,281.00), and by the inclusion of opportunity cost accruing after May 31, 1982.

#### 1. Excess Opportunity Cost Prior to May 31, 1982

#### a. Arguments of the Parties

In order to "correct" the court's previous calculation of opportunity cost, the plaintiffs suggest that the "excess" equity in-

cluded in the defendants' assumptions be deducted on a year by year basis and multiplied by the approximate average 90-day T–Bill rate for that year. For example, defendants' *Fishman* litigation expenses of $745,000 incurred as a result of the liability trial held in March and April of 1979, is initially considered "excess" equity for the following fiscal year. (6/1/79 to 5/31/80); that excess equity of $745,000, plus similar excess equity deducted in previous years, is then multiplied by the approximate T–Bill rate for that fiscal year. These year by year compounding totals are then added to determine the "excess opportunity cost" prior to May 31, 1982. This total amount, along with the opportunity cost accruing after May 31, 1982, is then simply subtracted from the 3.6 million dollar opportunity cost arrived at using the defendants' rejected factual assumptions.

Defendants object to this formulation on several grounds. First, contending the burden of demonstrating the appropriate opportunity cost rests upon the plaintiffs, defendants object to any modification in the calculation of the 3.6 million dollar opportunity cost on the grounds that there is no expert testimony in the record to support it.

Second, defendants contend the record is insufficient to support the assumptions made by the plaintiffs in recalculating the opportunity costs. Specifically, defendants object to the "assumption" in the plaintiffs' recalculation that litigation expenses incurred in a given fiscal year were completely paid by the beginning of the next fiscal year. For example, defendants contend it is unreasonable to assume the $745,000 in *Fishman* litigation expenses incurred in March and April of 1979 were completely paid by May 31, 1979, so as to allow the plaintiffs to credit the full amount of that excess equity for the entire 1979–80 fiscal year.

Finally, if this court elects to incorporate the adjustments proposed by plaintiffs, defendants contend this court must also adjust the 3.6 million dollar opportunity cost figure from which plaintiffs seek to subtract the excess opportunity cost. Specifically, defendants' contend "[a] more precise calculation of IBI's opportunity cost *at the Treasury Bill rates relied upon by IBI in its Motion To Amend* yields $4.25 million, not $3.6 million as the starting point for IBI's adjustment." (emphasis added) Plaintiffs object to raising the "starting point" on the grounds that the $3.6 million figure was "... proposed to the Court by defendants, testified to by defendants' own expert, and accepted by the Court."

**b. Discussion**

In arguing that the plaintiffs are not entitled to challenge the opportunity cost calculation adopted by the court, defendants essentially admit the calculation was incorrect. Defendants note:

> Absolute precision was a virtual impossibility because the court based its calculation on an opportunity cost rate which was not reflected in any of the proposed damage calculations prepared by the defendants' experts *and on a formula which rejected certain of defendants' underlying assumptions*, and, more importantly, because IBI elected to ignore the concept of opportunity cost altogether and offered the Court no alternative calculations.

Thus, the issue is not whether this court's calculation of opportunity cost was correct, defendants admit the calculation was incorrect, but, based upon the record, whether a more reasonable calculation can be substituted.

In the view of this court, a more reasonable calculation can be rendered. This court rejects the defendants' contention that the burden of producing a more reasonable calculation rested upon the plaintiffs. The cases relied upon by the defendants, simply state a plaintiff must show a loss of net, not gross, profits. *See e.g. Garrett's, Inc. v. Farah Manufacturing Co.*, 412 F.Supp. 656 (D.S.C.1976); *Peter v. Union Oil Co.*, 328 F.Supp. 998 (C.D.Cal. 1971); and *2361 State Corp. v. Sealy, Inc.*, 263 F.Supp. 845 (N.D.Ill.1967). The evidence concerning "opportunity cost", how-

ever, was in the nature of minimization; thus, the burden of proof remained upon the defendants. Dobbs, *Law of Remedies* (1973) § 3.7.

Similarly, the court finds the defendants' objections to the plaintiffs' assumptions concerning the payment of *Fishman* litigation expenses to be unpersuasive. Despite the single example cited by the defendants, the assumption that legal fees incurred in a given fiscal year would be fully paid by the beginning of the subsequent fiscal year seems quite reasonable. Indeed, in many years, that assumption might be quite conservative, as a substantial portion of the fees may have been paid well before the close of the preceding fiscal year.[1] Thus, in the view of the reasonableness of this assumption, the court does not deem the absence of evidence concerning the actual pattern of repayment as foreclosing the plaintiffs' proposed adjustments.

This court does, however, view it as appropriate to have the defendants' 3.6 million dollar opportunity cost figure recalculated utilizing the same interest rates the plaintiff proposes to use in calculating the "excessive" opportunity costs. Both sides base their calculations on the testimony of the same expert witness. It would be unreasonable, therefore, to allow the plaintiffs to calculate the "excessive" opportunity cost using higher interest rates than those utilized in originally calculating the 3.6 million dollar opportunity cost figure.

The 3.6 million dollar figure originally arrived at was based upon a rough estimate by the defendant's expert. Defendant's expert testified that the plaintiffs' opportunity cost, based upon an interest rate of prime plus three, was 8.6 million dollars. He arrived at this figure by multiplying the known yearly prime rate plus three by the defendant's invested capital. The defendant's expert then testified that

the average ninety day T–Bill rate over the ten year period was approximately two points below prime. He estimated that a one point downward adjustment in the interest rate utilized in calculating the plaintiffs' opportunity cost would result in about a one million dollar reduction in the actual dollar amount calculation. Consequently, the five percent difference between the prime plus three rate and the estimated average ninety day T–Bill rate resulted in an estimated five million dollar reduction in the actual dollar figure, from 8.6 million to 3.6 million.

In arriving at the yearly T–Bill rate utilized in calculating their "excess opportunity cost," plaintiffs simply subtracted two points from the known yearly prime rate.[2] Plaintiffs object to allowing the defendants' to utilize the same procedure to recalculate the 3.6 million dollar opportunity cost figure. Since defendants' expert testified the actual reduction would work out to approximately one million dollars per point, plaintiffs contend the defendants must abide by that figure.

As noted previously, this court does not agree. It is plain that the defendants' expert's one million dollar per point estimate was merely a ball park figure; it was not based upon an actual recalculation of the 8.6 million dollar figure at the lower T–Bill rate. Thus, this court deems it appropriate to allow the defendants to recalculate the 3.6 million dollar opportunity cost figure utilizing the same method employed by the plaintiffs.

Adjusting defendants' calculation of the opportunity cost by the T–Bill rates proposed in the plaintiffs' Motion To Amend yields a modified opportunity cost of $4,247,363. Reducing that figure by $633,660, a figure representing the compounding excess equity contributed prior to May 31,

---

1. Except for 1979, the annual *Fishman* fees ranged between $50,000–89,000.

2. In describing the method utilized in arriving at the yearly T–Bill rates, plaintiffs state:
   Defendants' expert, Mr. Peterson, testified that the average T–Bill rate was 5% less than the average rate at prime plus 3%. * * * (This

seems to make sense: it pegs the average T–Bill rate at about 2% below prime). Therefore, the T–Bill rate is approximated in plaintiffs' chart by the same method defendants have used *i.e.*, by subtracting 5% from the prime plus 3% rate shown in DX 424. * * *.

1982 multiplied by the applicable T–Bill rates, yields a partially adjusted opportunity cost of $3,613,703. In order to arrive at a completely adjusted opportunity cost figure, however, the opportunity costs calculated subsequent to May 31, 1982 must also be subtracted from the defendants' modified figure.

### 2. Opportunity Cost Calculated Subsequent to May 31, 1982

Plaintiffs also seek to reduce the opportunity cost figure adopted by the court on the grounds that it incorporates an unduly long computation period (i.e. beyond May 31, 1982). This court previously held plaintiffs' damages should be calculated as of May 31, 1982. Defendants do not directly contest either the merit of such a reduction or the plaintiff's calculation of the amount of such a reduction. Thus, the plaintiffs' motion to adjust the opportunity cost by deducting $563,570, the excess amount of opportunity cost calculated after May 31, 1982, is allowed. The completely adjusted opportunity cost, therefore, is $3,050,133. [$4,247,363—($633,660 + 563,570)]

### C. Post-Judgment Interest

Plaintiffs also contend post-judgment interest should begin to run as of July 20, 1984, the date originally set forth in the defendants' proposed judgment order. Defendants respond that post-judgment interest should not begin until the date the court actually entered judgment, November 21, 1984, and should be tolled during the pendency of the subject motions.

Title 28, Section 1961, of the United States Code, 28 U.S.C. § 1961 (1982), provides in relevant part, that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court ... *calculated from the date of the entry of judgment...*." (emphasis added) Entry of judgment is governed by Federal Rule of Civil Procedure 58. Rule 58 provides in relevant part:

... (1) upon a general verdict of a jury, *or upon a decision by the court that a party shall recover a sum certain ...*

the clerk, *unless the court otherwise orders*, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court; (2) upon a decision by the court granting other relief, or upon a special verdict or a general verdict accompanied by answer to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it. ... Attorneys shall not submit forms of judgment *except upon direction of court*, and these directions shall not be given as a matter of course.

In the present case, the court issued its findings of fact and conclusions of law concerning damages on June 28, 1984. In issuing those findings, this court concluded that plaintiff, IBI, was entitled to recover compensatory and punitive damages in a sum certain, and was entitled to have its compensatory damages trebled under the antitrust laws. Finding that the parties had failed to address whether the plaintiff was entitled to execute a judgment on both the treble and punitive damages awards, however, this court did not enter judgment in a sum certain, but, instead, directed the plaintiff to submit a proposed judgment order in conformance with the court's findings.

On or about July 20, 1984, plaintiffs submitted a proposed judgment order allowing plaintiff, IBI, to execute upon *both* the treble damage and punitive damage awards. In addition, plaintiffs' proposed judgment order provided for an award of prejudgment interest. The court set a briefing schedule to allow the parties to address the merits of both issues.

During the briefing of the issue, defendants' submitted their own proposed judgment order limiting recovery to treble damages *or* punitive damages, disallowing prejudgment interest, and allowing post-judgment interest from July 20, 1984. Briefing on the subject issues was completed on September 25, 1984, when defendants were granted leave to file a reply memorandum. The parties' memorandum did not address

the issue of the proper date from which to calculate post-judgment interest.

On November 20, 1984, this court issued a draft order limiting the plaintiff's recovery to either treble or punitive damages, and denying pre-judgment interest. On November 21, 1984, this court also issued a separate final judgment order providing, in part, that post-judgment interest would begin to be calculated on November 21, 1984.

■ While there is authority indicating post-judgment interest could be properly calculated from as far back as the issuance of the court's June 28, 1984 findings of fact and conclusions of law, this court declines to do so. *Compare Goldberg v. Medtronic,* 686 F.2d 1219, 1230 (7th Cir.1982) (holding the district court did not abuse its discretion in calculating post-judgment interest from the date of its decision rather than the entry of judgment) *with Barrios v. Louisiana Construction Materials Co.,* 465 F.2d 1157, 1167–68 (5th Cir.1972) (holding the district court did not abuse its discretion in calculating post-judgment interest from the judgment date rather than the date of the jury's verdict six weeks earlier.) In the present case, judgment was not entered on a sum certain until November 21, 1984. Prior to that time, the parties were uncertain whether plaintiff, IBI could collect $11,677,113 *or $14,177,113 plus pre-judgment interest.* The subsequent delay was not the result of a clerical error or other mistake; the court was simply involved in resolving issues the parties had failed to previously address.

Moreover, if post-judgment interest were held to have begun accruing on June 28 or July 20, 1984, this court would be faced with a rather anomolous result. On one hand, this court would be recognizing that "... the date of the entry of judgment" for purposes of triggering the accrual of post-judgment interest pursuant to § 1961 was in June or July of 1984. On the other hand, this court, in deciding the parties' present Rule 59(e) motions, filed in late November and early December of 1984, would be recognizing that the present motions were "... served not later than 10 days after the entry of the judgment." Fed.R.Civ.P. 59(e). Thus, this court, in essence, would be recognizing that judgment was entered on two separate dates, one for the purposes of post-judgment interest and one for the purposes of timely post-judgment relief. Plaintiffs' motion to amend this court's judgment order to provide for post-judgment interest accruing from July 20, 1984 is, therefore, denied.

Similarly, defendants' motion to toll the accrual of post-judgment interest during the pendency of the instant Rule 59(e) motions is denied. This court has been unable to locate any persuasive authority favoring such a procedure. *See Litwinowicz v. Weyerhaeuser Steamship Co.,* 185 F.Supp. 692 (E.D.Pa.1960). Moreover, this court refuses to exercise its discretion in favor of tolling the accrual of post-judgment interest.

### D. Typographical Corrections

Plaintiffs also point out a typographical error in the alignment of a chart appearing in the June 28, 1984 draft order. The June 28, 1984 order has been submitted for publication; appropriate steps have been taken to correct the error.

### CONCLUSION

For the reasons set forth herein, defendants' motion to amend is denied; plaintiffs' motion to amend is granted, in part, and denied, in part. The November 21, 1984 judgment order is amended as follows:

1. Paragraph 1 is amended to provide the named defendants are jointly and severally liable in the amount of $13,326,734. ($11,677,133 + [ (3,600,000 —3,050,133) × 3] )

2. Paragraph 2 is amended to provide the named defendants are jointly and severally liable in the amount of $3,942,238, plus punitive damages. [$3,392,371 + (3,600,000 - 3,050,133) ].